# James D. Andrews, Chaloux Properties and Miller & Miller Land, Inc. v. Robert G. Lathrop, Commissioner of Taxes

[315 A.2d 860]

No. 166-73

Present: Shangraw, C.J., Barney, Smith, Keyser and Daley, JJ.

Opinion Filed February 5, 1974

*Richard E. Davis Associates,* Barre, for Plaintiffs.

*Kimberly B. Cheney,* Attorney General, *Louis P. Peck,* Assistant Attorney General, *Benson D. Scotch,* Assistant Attorney General, and *Norris Hoyt,* Special Counsel to the Governor, for Defendant.

**Daley, J.** Appellant seeks to overturn the judgment of the Washington County Court, upholding the constitutionality of Chapter 236, Title 32, commonly referred to as the Land Gains Tax. The State rested without introducing evidence in the lower court, relying on the presumption of constitutionality. Prior to judgment, a motion by the appellant to reopen was entertained by the court, and a transcript of a press conference by the Honorable Thomas P. Salmon, Governor of the State of Vermont, was introduced. The court, however, concluded that such evidence had no bearing upon the issues before it.

The Land Gains Tax is a tax imposed in addition to all other taxes imposed under Title 32 on the gain derived from the sale or exchange of land held by the transferor less than six years. The rate of the tax is proportional to the percentage of gain and in inverse proportion to the holding period. A maximum rate of sixty per cent (60%) is imposed on land held less than one year and sold at a two hundred per cent (200%) or more gain. A minimum rate of five per cent (5%) is imposed on land held between five and six years as to which the gain is ninety-nine per cent (99%) or less.

The principal contention is that the six-year time period, insofar as it determines who shall and shall not be subject to the tax, violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. It appears that appellant attempted to prove, by the testimony of legislators and others, that the legislature enacted the land gains tax to deter land speculation within the State. This purpose, he argues, is so unrelated to the stated purpose of the tax as to constitute an arbitrary and capricious exercise of legislative power under the Equal Protection Clause. In addition, he charges that the State failed in its burden by not introducing evidence as to a reasonable basis for the six-year classification.

The sponsor's statement of purpose in the House legislative record, not a part of the formal text of the enactment, is as

follows: "It is the purpose of this bill to limit a person's property tax on his basic housing to five percent of his household income; and to provide partial funding for such property tax relief by imposing a tax on the gains from certain sales in exchanges of real property." Vermont House Bills—1973, H. 155, at 1. The lower court found this to be the primary purpose of the bill as finally passed. Nevertheless, the court held that the presumption of constitutionality had not been overcome. We agree.

Legislation may frequently serve multiple objectives. There is no requirement that the objectives served by the manner in which a tax is collected and those served by the manner in which it is spent be related to each other for constitutional purposes. *Cf. Magnano Co. v. Hamilton,* 292 U.S. 40 (1935). The Equal Protection Clause, recognizing that no scheme of taxation has yet been devised which is free of all discriminatory impact, "imposes no iron rule of equality, prohibiting the flexibility and variety that are appropriate to reasonable schemes of state taxation." *Allied Stores of Ohio* v. *Bowers,* 358 U.S. 522, 526 (1958). What is required is that the discriminatory classification not be capricious or arbitrary, but rest on some reasonable consideration of legislative policy. *Id.* Judicial inquiry, therefore, is not directed toward a comparison of legislative purposes, but rather toward the nexus between a classification and such purposes as it may serve.

The determination of purpose is a question of law, as it is in the process of statutory construction. The presumption of constitutionality sets the standard for that determination. Inherent within it is the further presumption that the legislature has not acted unreasonably, without purpose. Thus, if any reasonable policy or purpose for the legislative classification may be conceived of, the enactment will be upheld. *Allied Stores, supra.* We are not here concerned with a classification involving suspect criteria or affecting fundamental rights, such as may nullify the presumption of constitutionality and require a different standard as to legislative purpose. *Cf. Veilleux* v. *Springer,* 131 Vt. 33, 300 A.2d 620 (1973). Although such purpose is not subject to proof, it must be consistent with whatever indicia of purpose may be

drawn from the statute itself and other relevant materials. See *e.g., State* v. *Taranovich's Estate*, 116 Vt. 1, 68 A.2d 796 (1949).

The testimony of individual legislators and others as to the purpose the legislature had in mind in enacting this statute is of doubtful relevance to the present inquiry. The court has a broad discretion to consider matters which may relate to the determination of purpose. See generally *State* v. *Stevens*, 69 Vt. 411, 38 A. 80 (1897). However, in weighing evidence similar to that which was introduced in the hearing below, the Supreme Court has said, "Judicial inquiries into Congressional motives are at best a hazardous affair, and when that inquiry seeks to go beyond objective manifestations it becomes a dubious affair indeed." *Flemming* v. *Nestor*, 363 U.S. 603, 617 (1960). No cases have been brought to our attention in which the courts of this State have ever found such testimony to be within the meaning of legislative history for the determination of purpose.

■ The challenging party must initially delineate the nature of the discrimination and the classes of persons affected. See *San Antonio School District* v. *Rodriguez*, 411 U.S. 1 (1973). Appellant has asserted a variety of ways in which the Land Gains Tax is discriminatory in impact. He argues that the rural transferor is discriminated against by the tax exemption for the landowner's principal residence plus one acre, 32 V.S.A. § 10002, in that zoning regulations often require a minimum five acres for rural residential construction, in contrast to city landowners whose minimum lot requirements are often under one acre. He also alleges that, since nonresidents receive no benefits from the property tax relief provisions of the statute, they are deterred from purchasing land subject to the gains tax; thus the sellers' market available to such nonresident purchasers is limited unless they are willing to pay the tax, and the available buyers' market of prospective transferors whose land is subject to the tax is also limited. Appellant has failed to introduce any evidence to establish that such discrimination in fact occurs, and so has failed to meet his burden as to these allegations. See generally *San Antonio School District* v. *Rodriguez, supra; Champlain Valley Exposition* v. *Village of Essex Junction*, 131 Vt. 449, 455, 309 A.2d 25 (1973).

Appellant also charges discrimination between transferors arising out of the six-year holding period of 32 V.S.A. § 10003. The fact of differentiation is not here disputed and is, at any rate, apparent on the face of the statute. One who has held his property for 71 months is subject to a tax on his profits in sale of between five per cent (5%) and ten per cent (10%), while a transferor, otherwise in the same circumstance, who has held his property 72 months pays no such tax. It may be noted that a similar discrimination exists, in relative terms, between the other holding periods of § 10003, although appellant makes no contention in this regard. The ultimate issue to be determined is whether the classification in question rests on grounds relevant to the achievement of some legitimate State purpose.

In determining legislative purpose, the whole of the statutory provision may be looked to, its subject matter, and its effect and consequences. *Billings* v. *Billings*, 114 Vt. 512, 49 A.2d 179 (1946). One apparent effect of the holding period classification is to discourage the rapid turnover of land at high profits. The gains tax is a tax on profits in sale, so structured as to place a burden on the taxpayer which increases as his profit increases, and decreases as the period for which he retains the land lengthens. This alone is sufficient for constitutional purposes to support the view that the legislature could have had as a purpose the deterrence of land speculation.

Speculation in land may be adequately here defined as the purchase of land in the expectation of deriving a profit from its later sale at a higher price. Both high gain and a relatively short holding period are essential for such speculation, with its inherent risk of market fluctuation, to present an attractive alternative to, for example, depositing the equivalent capital in a savings account and drawing interest on it. See *The "Capital Asset" Concept*, 59 Yale L.J. 837 (1950).

In addition, we may take judicial notice of an increasing concern within the State over the use and development of land as a natural resource, a concern to which the legislature has responded in other instances with appropriate legislation. No. 250 of the Public Acts of 1969 (Adj. Sess.). Speculation falls within the ambit of such concern as a land use; indeed it

has a bearing on many other uses to which the land might be put.

It is not the function of this Court to pass upon the validity of this concern or the wisdom of the means the legislature has chosen to deal with it, but merely to determine whether the legislature may have acted in response to such a concern and whether in doing so it acted within its constitutional bounds. *Lehnhausen* v. *Lake Shores Auto Parts Co.*, 410 U.S. 356 (1973); *General Mills* v. *Div. of Employment and Security*, 224 Minn. 306, 28 N.W.2d 847 (1947). It is by now beyond question that the legislature may legislate to achieve particular social and economic ends by the manner in which a tax is imposed, even if such objectives might otherwise be beyond the legislature's constitutional powers. *San Antonio School District* v. *Rodriguez*, 411 U.S. 1 (1973); *Magnano Co.* v. *Hamilton*, 292 U.S. 40 (1935). The objective may extend to discouragement of what is otherwise, as, here, a legitimate economic activity. *Magnano Co.* v. *Hamilton, supra; Virgo Corp.* v. *Paiewonsky*, 384 F.2d 569 (3d Cir. 1967), *cert. denied*, 390 U.S. 1041 (1968). We find no reason to hold, therefore, that the legislature could not have acted to restrict land speculation by means of the land gains tax structure, within its constitutional powers.

The only remaining equal protection issue is whether the classification created by the tax provision is reasonably related to the achievement of such a legislative goal. Appellant argues that the classification must be found to be substantially related to the object of the legislation. *Royster Guano Co.* v. *Virginia*, 253 U.S. 412 (1920). This is no more than to say that the relationship between classification and objective cannot be so tenuous as to require a Rube Goldberg structure of casual connections to establish a rational nexus. No such situation exists here. The tax places a burden on short-term ownership and on high profits in the resale of lands, two attributes of property ownership closely linked to the holding of land for speculative purposes. The taxing of short-term ownership as opposed to long-term ownership, and the taxing of short-term ownership at a higher rate, is integral to the deterrent affect. No other objective of property ownership is so directly affected as is land speculation. Indeed,

certain provisions of the tax evidence an attempt on the part of the legislature to minimize the tax impact on property owned and sold for other reasons. 32 V.S.A. § 10002; 32 V.S.A. § 10005(c).

Appellant further argues that there is no reasonable basis for the specific choice of a six-year holding period, relying largely on the holding of *Louisville Gas Co.* v. *Coleman,* 277 U.S. (1928). There it was held that no reasonable basis existed for a tax which fell on mortgages maturing in over five years and exempted mortgages of five years or less. Justice Holmes argued on dissent:

> When a legal distinction is determined, as no one doubts that it may be, . . . a point has to be fixed or a line . . . drawn, . . . to mark where the change takes place. Looked at by itself, without regard to the necessity behind it, the line or point seems arbitrary. It might as well, or nearly as well, be a little more to one side or the other. But when it is seen that a line or point there must be, and that there is no mathematical or logical way of fixing it precisely, the decision of the legislature must be accepted unless we can say that it is very wide of any reasonable mark. *Id.* 277 U.S. at 41, 48 S.Ct. at 426.

It is not entirely clear whether the majority opinion rested on the lack of a reasonable basis for any distinction in periods of maturation, or for the particular five-year period chosen as Holmes' dissenting opinion suggests. If the latter is the case, it is clear that the Holmes dissent is the dominant view today, and that a quantitative distinction created by the legislature will be upheld unless it is so "wide of the mark" that it cannot be said to tend toward achievement of any legislative purpose it might be said to serve. *Continental Baking Co.* v. *Woodring,* 286 U.S. 352 (1932); *Tax Commissioners* v. *Jackson,* 283 U.S. 527 (1930) ; *Chepard* v. *May,* 71 F.Supp. 389 (S.D.N.Y. 1947) ; *City of San Antonio* v. *CAB,* 374 F.2d 326 (D.C. Cir. 1967).

Such an approach is consonant with the presumption of constitutionality, which the appellant in this case must overcome.

> In the nature of the case [a state legislature] cannot record a complete catalogue of the considerations which move its members to enact laws. In the absence of such a record courts cannot assume that its action is capricious, or that, with its informed acquaintance with local conditions to which the legislation is to be applied, it was not aware of the facts which afford reasonable basis for its action. Only by faithful adherence to this guiding principle of judicial review of legislation is it possible to preserve to the legislative branch its rightful independence and its ability to function. *Carmichael* v. *Southern Coal Co.,* 301 U.S. 495, 510 (1937).

This broad discretion as to classification has been given particular recognition in the field of taxation, *Kentucky* v. *Madden,* 309 U.S. 83 (1940), not only as an expression of the principle of separation of powers as discussed above, but also to enable the State to adequately fulfill its constitutional role in the federal system. *San Antonio School District* v. *Rodriguez,* 411 U.S. 1, 36 L.Ed.2d 16 (1973); *Veilleux* v. *Springer,* 131 Vt. 33, 300 A.2d 620 (1973), (Barney, J., dissenting opinion). The appellant has not shown that the six-year holding period is an unreasonable legislative classification in light of the foregoing standard.

 Appellant raises a related issue of double taxation, arguing that it is objectionable to require the transferor of land to pay a capital gains tax and a land gains tax on the same transfer. He concedes that double taxation is not *per se* unconstitutional.

> The Fourteenth Amendment no more forbids double taxation than it does doubling the amount of a tax; short of confiscation or proceedings unconstitutional on other grounds. *Ft. Smith Lumber Company* v. *Arkansas,* 251 U.S. 532, 533 (1920) (J. Holmes).

Appellant contends the legislature has failed to express an intent to levy an additional burden on those already taxed. The cases cited stand only for the proposition that each imposition of a tax must be firmly grounded in legislative intent. *Olson Oil* v. *Oklahoma Tax Commission,* 198 Okla. 607, 180 P.2d 622 (1947); *Tennessee* v. *Whitworth,* 117 U.S. 129 (1886). Appellant does not argue that the capital gains

tax is without basis in legislative intent. Nor does he argue that the legislature has not clearly expressed its intent as to imposition of the land gains tax. Moreover, 32 V.S.A. § 10001 evidences an express legislative intent to impose an additional burden on those already taxed.

It has also been charged that the tax was enacted in violation of Chapter II, § 6, of the Vermont Constitution, which provides that "all Revenue bills shall originate in the House of Representatives; but the Senate may propose or concur in amendments as on other bills." Application of this provision is a matter of first impression here. Serious questions have arisen elsewhere as to the extent to which the judicial branch may intrude upon the legislative process to declare an act, duly approved by both houses and signed by the executive, void for procedural infirmities. *Field v. Clark*, 143 U.S. 649 (1892). See also *Rainey v. United States*, 232 U.S. 310 (1914); *Flint v. Stone Tracy Co.*, 220 U.S. 107 (1910). The Supreme Court of Pennsylvania has held that a similar provision in the Pennsylvania Constitution (Art. III, § 14) presented no justiciable question, the proper remedy being by way of point of order on the legislative floor prior to enactment. *Mikell v. Philadelphia School District*, 359 Pa. 113, 58 A.2d 339 (1948).

It is not necessary to resolve such issues here, which at any rate have not been adequately briefed by the proponent, as the present statute presents no constitutional infirmities within the meaning of Chapter II, § 6. Where the matter has been considered in other jurisdictions, the term "revenue bills" has been construed as referring to levy taxes in the strict sense of the word, whose primary purpose is to raise revenue to be applied in meeting the general expenses and obligations of the government, and not bills which create revenue incident to other purposes. *Millard v. Roberts*, 202 U.S. 429 (1905); *Twin City Bank v. Nebeker*, 167 U.S. 196 (1897); *Mikell v. School Dist. of Philadelphia*, 359 Pa. 113, 58 A.2d 339 (1948) (and cases cited therein). This is in accord with the generally accepted view that the constitutional provision had its origin in the conflict between the popularly-elected English Commons and the Crown-dominated House of Lords, and was adopted in the Federal Constitution, at a time when members of the Senate were elected by

the state legislatures, in order to preserve direct control by the people over the taxing process. 1 J. Story, Constitution § 874 *et seq.* (5th ed. M. Bigelow 1891); *Mikell* v. *School Dist. of Philadelphia, supra,* 58 A.2d at 341, n. 1; *Twin City Bank* v. *Nebeker, supra,* at 202.

The lower court here found that the whole bill "had its primary purpose to provide tax relief to certain taxpayers" and further that the primary purpose of the taxing provision was to raise revenue specifically to fund the tax relief program. The bill was not, therefore, a revenue bill within the meaning of Chapter II, § 6, of the Vermont Constitution. In addition, since the revenue-raising provisions were germane to the subject matter of the whole bill, they could properly have been raised for consideration as an amendment by the Senate. *Flint* v. *Stone Tracy Co.,* 220 U.S. 107 (1900). Thus further inquiry into the origins of these provisions is made unnecessary.

The foregoing disposes of the merits of the case. Two of the original plaintiffs were denied standing in the court below. Any error arising from such ruling would be harmless, as the standing of the remaining plaintiff was sufficient to raise all issues presented.

*Judgment affirmed.*